**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Frederick MATHEWS,
Defendant-Appellant.**

No. 85–2904.

United States Court of Appeals,
Seventh Circuit.

Argued June 12, 1986.

Decided Oct. 9, 1986.

Rehearing and Rehearing En Banc
Denied Oct. 29, 1986.

Jeffrey A. Kaufman, Gimbel Gimbel & Reilly, Milwaukee, Wis., for defendant-appellant.

Jan E. Kearney, Asst. U.S. Atty., Milwaukee, Wis., for plaintiff-appellee.

Before BAUER, Chief Judge, and COFFEY and RIPPLE, Circuit Judges.

BAUER, Chief Judge.

The defendant, Frederick Mathews, was convicted of receiving money as an official of the Small Business Administration in violation of 18 U.S.C. § 201(g). He appeals, alleging three grounds for reversal: that the district court erred by refusing to allow Mathews to claim entrapment unless Mathews admitted all elements of the crime, including the element of intent; that the district court erred in excluding for cause several veniremen who expressed disapproval of tape recording conversations without the knowledge of all parties; and that the district court erred in denying Mathews' motion for a mistrial based on the prosecution's use of peremptory strikes to remove all black veniremen from the jury. We find the district court committed no error and affirm its judgment of conviction.

## I.

Mathews was employed in the Milwaukee office of the Small Business Administration ("SBA") as a Business Development Specialist in charge of the "8A Program." The 8A Program is designed to aid small businesses owned by socially and economically disadvantaged concerns. Applicants for the 8A Program become clients of the SBA. With the SBA serving as primary contractor and the 8A client acting as subcontractor, the SBA attempts to procure government contracts on behalf of 8A clients and to help them perform on the contract.

The charge of which Mathews was convicted concerns Mathews' relationship with James DeShazer. DeShazer is the president and owner of Midwest Knitting Mills. Midwest Knitting Mills was a participant in the 8A Program and obtained several contracts through the SBA. Mathews was DeShazer's main contact at the SBA.

The evidence at trial showed that Mathews accepted loans from DeShazer (Mathews says two, the government says more). Mathews claims the loans, including the loan involved in this case, were personal loans from DeShazer unrelated to Mathews' duties at the SBA. The government and DeShazer claim the loans were gratuities required by Mathews to obtain his cooperation in SBA matters.

In support of its theory, the government introduced evidence that included tape recordings of conversations between Mathews and DeShazer discussing the loan that resulted in Mathews' arrest and prosecution. These conversations had been covertly taped by DeShazer under the direction of the FBI which began investigating Mathews in response to a complaint by DeShazer to a Navy purchasing agent regarding Mathews' repeated requests for loans.

The jury believed the government's version of the facts and convicted Mathews of the charge of accepting a thing of value as a public official for an official act to be performed by him, a violation of 18 U.S.C. § 201(g). The trial judge entered judgment accordingly and sentenced Mathews to three years probation, the first two years to be served under house arrest. Mathews appeals.

## II.

Mathews claims the trial court erred in denying his motion *in limine* to present evidence on the defense of entrapment. Mathews asks us to reconsider the rule in this circuit that requires a defendant who wishes to plead entrapment to admit all elements of the crime, including the element of intent. *United States v. Rodgers*, 755 F.2d 533, 550 (7th Cir.1985), *cert. denied*, — U.S. —, 105 S.Ct. 3532, 87 L.Ed.2d 652 (1985). He acknowledges that this rule is in accord with the Third, Sixth, and Tenth circuits, but argues that a better rule would require a defendant to admit only the acts of a crime, not the intent, before being allowed to plead entrapment. Mathews cites cases from the First, Fifth, and D.C. circuits as examples of decisions that follow this rule. *United States v. Caron*, 588 F.2d 851 (1st Cir.1978); *United States v. Henry*, 749 F.2d 203 (5th Cir. 1984) *(en banc); United States v. Kelly*, 748 F.2d 691 (D.C.Cir.1984). Mathews does not ask us to go so far as those circuits

that he claims allow a defendant to deny all elements of the crime and at the same time plead entrapment. *United States v. Demma*, 523 F.2d 981 (9th Cir.1975); *Crisp v. United States*, 262 F.2d 68 (4th Cir.1958).

■ Although we acknowledge some diversity of opinion among the circuits, we see no reason to change our rule requiring a defendant to admit all elements of the crime before being allowed to plead entrapment. When a defendant pleads entrapment, he is asserting that, although he had criminal intent, it was "the Government's deception [that implanted] the criminal design in the mind of the defendant." *United States v. Russell*, 411 U.S. 423, 436, 93 S.Ct. 1637, 1645, 36 L.Ed.2d 366 (1973); *United States v. Rodgers*, 755 F.2d 533, 550 (7th Cir.1985). We find this to be inconsistent *per se* with the defense that the defendant never had the requisite criminal intent. We see no reason to allow Mathews or any defendant to plead these defenses simultaneously.

### III.

■ Mathews also complains that the exclusion for cause of several veniremen who expressed misgivings about covert tape recordings created a jury skewed in favor of the government and unrepresentative of the community. He argues that the trial judge should have conducted a more extensive inquiry into the basis for the veniremen's objection to such evidence in order to ascertain whether the veniremen felt they could give the evidence its proper weight despite their initial reservations.

We disagree with Mathews for two reasons. First, a trial judge's questioning during *voir dire* is subject to limited review. In light of the special circumstances of the situation (to be outlined below) and the great deference that we accord trial judges in this area, *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841, 844 (1985), we see no reason to overturn the judgment of the trial court on the basis of the exclusion of these veniremen. Second, the trial judge called a side bar during *voir dire* to give Mathews' counsel the opportu-

nity to suggest an appropriate route for the trial court to take regarding these veniremen. Mathews' counsel expressed no objection and asked the court to proceed as it had been before the side bar. We find it difficult to accept Mathews' belated allegations on appeal that the judge's action taken at Mathews' request denied him his sixth amendment right to an impartial jury representing a cross-section of the community.

### A.

The trial judge was forced to deal with a difficult and all too common situation during *voir dire*. The court had properly and methodically questioned the veniremen as a group about their limitations and biases regarding the case. After its first twenty-two questions, the court had excused only six persons for cause. The court's twenty-third question inquired whether the veniremen had "any concern about tape recording conversations when one party is not aware that it is being recorded." (Trial Transcript at 43). One veniremen expressed concern, and the court questioned her in depth about whether her reservations about the evidence-gathering method would interfere with her ability to weigh that evidence, whether she still had reservations knowing that she would only hear the tapes if they were found admissible by the court according to the rules of evidence, and whether her reservations would remain regardless of the nature of the investigation. When the veniremen continued to express doubt, the judge dismissed her.

As acknowledged by counsel for both sides, what followed was a classic case of potential jurors jumping on the opportunity to avoid jury duty by suddenly realizing that they too shared the bias of the venireman just dismissed. Several veniremen immediately brought their newly discovered problem with accepting covert tape recordings to the attention of the trial judge. The judge dismissed the first bandwagoner without further questioning, knowing the veniremen had heard the examination of the venireman just dismissed. The judge

dismissed the second and third followers after they offered short explanations of the basis for their objections to taping. When a fourth venireman suddenly discovered a deep-seated distaste for covert taping, the judge questioned her in depth and reiterated that tapes might not even be introduced into evidence and would only be heard if they were found admissible according to the rules of evidence. The veniremen then relented, declared she could give the evidence appropriate weight, and was retained on the panel. Undeterred, a fifth venireman took up the mantle and voiced objections to covert taping. The court was examining him further when still another venireman interrupted with questions regarding the nature of the tapes.

Seeing the direction that the *voir dire* was going, the judge called a side bar. As represented to this court at oral argument by both counsel (both of whom also served as trial counsel), the judge asked both parties for their preferences as to the appropriate manner for the court to deal with this mass exodus of potential jurors. Mathews' counsel admits that he did not object to the actions that the judge had taken up to that point and in fact encouraged him to continue.

The judge then dismissed the venireman he had been questioning and dealt with the remaining four veniremen who claimed that they too disliked covert taping. The judge questioned the first three of these four in depth, released one and kept two. The final objecting venireman was also released.

With the supply of potential jurors now exhausted, the court called a recess. The following day, the new veniremen expressed no misgivings about taping, and the *voir dire* proceeded without further problem.

### B.

We see nothing wrong with the trial judge's conduct of the *voir dire*. At least six times, the judge conducted in depth questioning in front of the panel of veniremen as a group regarding the level of bias necessary to demonstrate cause for being excused from jury duty, bias that must remain regardless of the rules of evidence and the instructions of the judge. The judge need not, as Mathews contends, in every case question each juror individually regarding each possible area of prejudice. We review the *voir dire* only to see "whether the procedure used for testing impartiality created a reasonable assurance that prejudice would be discovered if present." *United States v. Dellinger*, 472 F.2d 340, 367 (7th Cir.1972), *cert. denied*, 410 U.S. 970, 93 S.Ct. 1443, 35 L.Ed.2d 706 (1973). We "will not find that a trial court abused its discretion in conducting voir dire where there is 'sufficient questioning to produce, in light of the factual situation involved in the particular trial, some basis for a reasonably knowledgeable exercise of the right of challenge.' " *United States v. Hastings*, 739 F.2d 1269, 1273 (7th Cir. 1984), *cert. denied*, 469 U.S. 1218, 105 S.Ct. 1199, 84 L.Ed.2d 343 (1985) (citations omitted). We may only reverse a trial judge's decision on exclusion of veniremen for cause if it is a "clear case" of prejudicial error. *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841, 844 (1985). The judge's conduct easily satisfies this limited standard of review, and we accordingly decline to disturb the trial court's decision.

Furthermore, Mathews had every opportunity to object during *voir dire* and failed to do so. The judge even asked the parties how they wished him to proceed in light of the developing problem with the veniremen's bias regarding covert taping. Mathews, by his counsel, encouraged the judge to continue as he had been before the side bar, which the judge did. This is clearly a waiver and more of whatever right Mathews may have had to object to the conduct of the *voir dire*.

Finally, we feel compelled also to note that we are uncertain what harm Mathews could claim even if the conduct of the *voir dire* would have been improper. The judge did not fail to exclude for cause a venireman that Mathews wished excluded (which

would have forced Mathews to use a peremptory strike and thus potentially prejudice his case), and the trial judge did not conduct the *voir dire* so that a venireman who may or may not have been prejudiced remained on the panel (which would have resulted in the same harm). Instead, the judge immediately excluded veniremen who expressed some bias against the government without first questioning them further on an individual basis. We are doubtful whether this harmed Mathews in any way or whether any harm that did result can be the basis of a sixth amendment challenge. As stated by the Ninth Circuit in addressing a situation in which the appellant contended that the trial judge had erred in excusing two jurors for cause on his own motion:

> Moreover, regardless of the propriety of excusing two veniremen, we would not be inclined to reverse. The defendant is entitled to an array of impartial jurors to whom he may direct his peremptory challenges but, having been provided with such a panel, he suffers no prejudice if a juror, even without sufficient cause, is excused by the Court.

*United States v. Calhoun,* 542 F.2d 1094, 1103 (9th Cir.1976), *cert. denied sub nom., Stephenson v. United States,* 429 U.S. 1064, 97 S.Ct. 792, 50 L.Ed.2d 781 (1977).

## IV.

Mathews also contends the trial court erred in denying his motion for mistrial based on the prosecution's use of its peremptory strikes to exclude all blacks from the jury. We disagree.

### A.

The Supreme Court recently addressed this issue in *Batson v. Kentucky,* —— U.S. ——, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and the principles elucidated there control this case. In *Batson,* the court established that "the State's privilege to strike individual jurors through peremptory challenges is subject to the commands of the Equal Protection Clause," *Batson,* 106 S.Ct. at 1718, and "the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant." *Id.* at 1719. When a defendant alleges the prosecution has used its peremptory challenges in a discriminatory fashion, therefore, the general principles of Equal Protection apply. *Id.* at 1719.

The burden is on the defendant initially to make "a *prima facie* case of purposeful discrimination by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." *Id.* at 1721. To make this showing, it is not necessary for the defendant to show that the prosecutor's actions in past cases have demonstrated a pattern or practice of discriminatory use of peremptory challenges. *Id.* at 1720–21. "A defendant may establish a *prima facie* case of purposeful discrimination in selection of the petit jury solely on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial. To establish such a case, the defendant first must show that he is a member of a cognizable racial group, ... and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race." *Id.* at 1722–23. Then, "the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used [peremptory challenges] to exclude the veniremen from the petit jury on account of their race." *Id.* at 1723. These "relevant circumstances" may include a pattern of peremptorily striking black jurors, the prosecution's questions and statements during *voir dire,* and the prosecution's statements and actions in exercising his peremptory strikes. *Id.*

If the trial judge determines that the defendant has made a sufficient *prima facie* showing, "the burden shifts to the State to come forward with a neutral explanation for challenging black jurors." *Id.* at 1723. Although "the prosecutor's explanation need not rise to the level justifying exercise of a challenge for cause," *Id.* at 1723, "the

prosecutor may not rebut the defendant's *prima facie* case of discrimination by stating merely that he challenged jurors of the defendant's race on the assumption—or his intuitive judgment—that they would be partial to the defendant because of their shared race." *Id.* Neither may the prosecutor satisfy his burden "by denying that he had a discriminatory motive or 'affirming his good faith in individual selections.'" *Id.* at 1723 (citations omitted). The prosecutor's explanation must be "clear and reasonably specific," it must contain "'legitimate reasons' for exercising the challenges," and it must be "related to the particular case to be tried." *Id.* at 1723 n. 20.

The defendant, of course, bears the ultimate burden of proving intentional discrimination. *Id.* at 1721 and 1723–24. The duty to determine whether such a showing has been made is entrusted to the sound discretion of the trial courts who are "experienced in supervising *voir dire.*" *Id.* at 1723.

For purposes of review on appeal, *Batson* reminds us that "'a finding of intentional discrimination is a finding of fact' entitled to appropriate deference by a reviewing court," and that, "[s]ince the trial judge's findings in the context under consideration here largely will turn on evaluation of credibility, a reviewing court ordinarily should give those findings great deference." *Id.* at 1724 n. 21. Thus, we may only reverse the trial judge's determination that the prosecution's peremptory challenges were not motivated by intentional discrimination if that determination is clearly erroneous. *United States v. Tucker*, 773 F.2d 136, 142 (7th Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 3338, 92 L.Ed.2d 742 (1986).

**B.**

■ Applying these principles to the facts here, we have no doubt that the trial court properly denied Mathews' motion for mistrial based on the prosecution's use of peremptory challenges.[1] The judge's inquiry was careful and thorough, and his underlying findings were reasonable and consistent. The trial court's ultimate finding that the government did not intentionally discriminate when exercising its peremptory challenges cannot be said to be clearly erroneous.

The trial judge, without the benefit of *Batson's* specific guidelines, undertook a thorough inquiry in response to Mathews' pre-trial motion challenging the government's use of its peremptory challenges to remove all blacks from the jury. After listening to Mathews' objection outside the presence of the jury, the judge asked the prosecutor for her response. The prosecutor then explained in some detail the basis for each of her strikes against the three black veniremen. We recount it here in full as an example of the type of explanation that satisfies *Batson's* requirements that such explanations be clear and reasonably specific, contain legitimate reasons, and be related to the particular case.

I did have reasons. The choice that I made this morning was an unusually difficult one, and as [defense counsel] is probably aware, the gentleman, one of the gentlemen who was among the people that I just mentioned, was my last strike, and one over which I hesitated at some length. It is always very difficult to describe your reasons why you choose or do not choose a juror. When you read cases that say you are supposed to tell what your reasons are, I think this must be written by people who never tried a case, but I will do the best I can.

With respect to the lady, Mrs. Switzer, she was [among] those people who indicated a grave reservation with respect to her ability to adequately look at and appraise the tape recording evidence, and

---

1. Because we find the trial judge's conduct of the proceedings below satisfies *Batson's* requirements, we need not (and expressly do not) decide whether *Batson* applies retroactively to this case. *See Allen v. Hardy,* —— U.S. ——, 106 S.Ct. 2878, 92 L.Ed.2d 199 (1986) (*Batson* does not apply retroactively to collateral attack on conviction).

she along with the other people who had raised similar objections yesterday, I struck for, I think probably self-evident reasons, that type of evidence is going to be important to my trial and I believe that it will be very difficult for me to get a fair hearing on my side of the case if there are people who just plain believe that is not right under any circumstances no matter what the judge should instruct them.

With respect to Ms. Phenix, I noted this morning when I came into the courtroom, I thought yesterday afternoon, as a matter of fact, that I would like to keep her. She is a sort of basic Milwaukee person on paper at least, what we know of her. This morning she was late in coming, she was not the only one, but she was among people who [arrived] after two o'clock this afternoon when the jury was supposed to be here in their seats. And this indicated to me a lack of commitment to the importance of this proceeding. That was one of the reasons why I felt that given a choice between Ms. Phenix and another juror, I would select a juror who evidenced more of a commitment.

In addition to that, while watching her in the courtroom she did not seem to be attentive to the proceedings at hand. I know this is always very difficult to judge these things on the basis of such a short exposure to a person, but that was my impression of her. That is the reason why I decided to strike her.

My last strike as I mentioned a few moments ago, was Mr. Robinson. I believe that is his name, Declinton Robinson. The reason why I struck him is [admittedly a personal] one. I don't know what is going to happen to me if I put this on the record, but I am going to anyway because the Court needs to know my reasons.

Mr. Declinton was sitting directly to my right, only a space of approximately four feet from me, and both yesterday and today he spent a very great deal of time in examining me in a way which I felt was in the end becoming rather hostile. Now, I realize that this is a subjective judgment, but it was very marked to me, Judge. It was something that I noticed and felt was rude for one thing, and indicated one of two things, either he was going to be very strongly in support of my position or he was going to be very strongly against my position. Under those circumstances I felt that there were other jurors who more fit the profile of a juror that I was looking for.

There is always a thousand other things, but I feel that at least this much should be placed on the record at this point because I feel that it would have been to my advantage, rather than my disadvantage to have had black jurors on this particular jury, because my witnesses, too, your Honor, my most important witness, Mr. James DeShazer, is like Mr. Mathews, black, and I feel that it is important that he get a fair hearing, and so I gained nothing. I gained nothing. I have to select my jurors one at a time, as I see it and those are my reasons.

Trial Tr. pp. 83–86. Following this explanation, the judge asked Mathews' attorney for his response, and he pointed out that other white jurors had also been late but had not been struck by the government.

The judge then proceeded to weigh the factors put forth by both sides as well as other surrounding circumstances. The judge stated that he agreed that the first venireman struck had given particularly hesitant responses to the judge's inquiry following the venireman's initial objection to covert taping and that the peremptory strike was "well justified." With regard to the second black venireman struck, the judge also agreed that the person had demonstrated a pointed disinterest in the proceedings evidenced not only by her tardiness but also by her posture and demeanor. With regard to the third venireman struck, the judge noted that the prosecutor's explanation was subjective and not based on factors that the court had also observed but that this did not necessarily undermine her explanation. The court then considered the explanation in light of other surround-

ing circumstances. The court noted that the key witnesses for both sides in this case were black, which would discount any advantage that a discriminating prosecutor might perceive in striking blacks from the jury. The court noted that there was no evidence that the prosecution had maintained a pattern or practice of striking blacks from juries in cases where the defendants are black, and further commented that the court's personal experience showed the contrary. Finally, the court noted that the demeanor of the prosecutor while exercising her peremptory challenges and the time that she took in so doing indicated that she was not simply striking venireman because they were black but was engaging in a careful process of deliberation based on many factors. In light of all of these circumstances, the judge denied Mathews' motion for mistrial.

The judge's inquiry fits easily into the format established in *Batson*. In his motion, Mathews put before the court the facts that he is black (a cognizable racial group) and that the prosecution used peremptory challenges to strike members of his racial group from the jury. Mathews also noted that the government eliminated all blacks from the jury, not just a few, as additional evidence of the prosecution's discriminatory motive. Although we need not so decide, the trial judge apparently treated this as sufficient *prima facie* evidence of the government's discriminatory intent in exercising its peremptory challenges. The judge then gave the prosecution a chance to rebut this inference with a neutral explanation for challenging the black veniremen. This the government did with an explanation that contained legitimate reasons, was clear, was reasonably specific, and was related to the particular case. The judge, after hearing Mathews' response to that explanation, considered all relevant circumstances and ruled that Mathews had not carried his ultimate burden of proving discriminatory intent.

The judge's inquiry was based on the proper criteria as established in *Batson*. We see no reason to overturn as clearly erroneous the judge's denial of Mathews' motion for mistrial.

### V.

In sum, we find it was not error for the trial judge to require Mathews to admit all elements of the crime including intent before allowing him to plead entrapment, it was not error to exclude for cause several veniremen who expressed misgivings regarding the use of covert tapings, and it was not clearly erroneous for the judge to deny Mathews' motion for mistrial based on the prosecution's alleged discriminatory use of peremptory challenges. The decision of the district court is AFFIRMED.